IN THE UNITED STATE BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PAULS VALLEY HOSPITAL AUTHORITY | ) | No. 13-10791-SAH |
| | ) | (Chapter 9) |
| | ) | |
| Debtor. | ) | |

**MOTION TO REQUIRE DEBTOR TO ASSUME OR REJECT MANAGEMENT
AGREEMENT WITH SSM HEALTH CARE OF OKLAHOMA AND
BRIEF IN SUPPORT AND
NOTICE OF OPPORTUNITY FOR HEARING**

SSM Health Care of Oklahoma, Inc. ("SSM" or "Manager") moves the Court pursuant to 11 U.S.C. § 365 to require Pauls Valley Hospital Authority d/b/a Pauls Valley General Hospital (the "Debtor" or "Owner") to immediately reject the Management Agreement between SSM and the Debtor or to shorten the time within which the Debtor may elect to assume or reject the Management Agreement to a reasonable time not to exceed 30 days.

**NOTICE OF OPPORTUNITY FOR HEARING**

**Your rights may be affected. You should read this document carefully and consult your attorney about your rights and the effect of this document.** If you do not want the Court to grant the requested relief, or you wish to have your views considered, you must file a written response or objection to the requested relief with the Clerk of the United States Bankruptcy Court for the Western District of Oklahoma, 215 Dean A. McGee Avenue, Oklahoma City, OK 73102 no later than 14 days from the date of filing of this request for relief. You should also serve a file-stamped copy of your response or objection to the undersigned movant's attorney and file a certificate of service with the Court. If no response or objection is timely filed, the Court may grant the requested relief without a hearing or further notice.

12099490_1

1

**STATEMENT OF FACTS**

1. The Debtor, Pauls Valley Hospital Authority, is a public trust that owns and operates a hospital in the City of Pauls Valley, Oklahoma known as the Pauls Valley General Hospital (the "Hospital"). On March 1, 2013, the Debtor filed a Chapter 9 bankruptcy petition and continues to operate the Hospital.

2. SSM and the Debtor entered into a Management Agreement effective February 1, 2012 (the "Management Agreement") whereby SSM was to provide certain management services for the Hospital. A copy of the Management Agreement is attached as "Exhibit A". To date, the Debtor has neither assumed nor rejected the Management Agreement. Contemporaneous with the filing of this motion, SSM is filing a motion for relief from the automatic stay to allow SSM to terminate the Management Agreement for the Debtor's post-petition breach of that agreement.

3. Under the Management Agreement, the Debtor as Owner retained the ultimate control and responsibility for operation of the Hospital and the financial obligations relating thereto. Several of the relevant provisions of the Management Agreement include:

> 2.1…Notwithstanding the authority granted to Manager herein, Manager and Owner agree that Owner has, and at all times while this Agreement remains in full force and effect shall exercise, the ultimate control and direction of the assets and affairs of Hospital, including without limitation, all medical, professional and ethical affairs of Hospital.
>
> 6.1 <u>General Manager</u>. In taking any action pursuant to this Agreement, Manager will be acting as an independent contractor for the Hospital, and nothing in this Agreement shall be construed … (b) as requiring Manager to bear any portion of the losses arising out of or connected with the ownership or operation of the Hospital.
>
> 6.2 <u>Authority of Owner</u>. (a) It is understood that during the term of this Agreement, Owner is and will remain the responsible licensee of the Hospital and, as such, shall be fully liable and legally accountable at all times to all patients and government organizations for all patient care and

> funds, and all other aspects of the operation and maintenance of the Hospital.
>
> 8.1 <u>Responsibility for Costs of Operation and other Liabilities</u>. Owner shall be solely responsible for any local, state and federal taxes, costs and assessments (including but not limited to social security taxes, unemployment insurance, and workers' compensation insurance or other governmental obligations and all other costs and expenses imposed on Hospital) of any kind associated with Hospital, and Manager shall have no liability or obligation with respect thereto. Owner agrees that Manager shall not, by entering into and performing this Agreement, become liable for any of the Costs of Operation, existing or future obligations, liabilities or debts of the Owners and/or Hospital whatsoever.

4. In the Management Agreement, the parties set forth the stated purposes of the Agreement which were collectively defined as the "Primary Goal" and include to "(a) Provide quality hospital services; … (c) Establish and maintain an excellent public image of Hospital; (d) Establish and maintain quality staffing of Hospital; (e) Operate Hospital on a sound financial basis …"

5. Under the Management Agreement, SSM provides the chief executive officer who is an employee of SSM. All other persons who work at the hospital are employees of or contractors with the Debtor. While the Management Agreement contemplated that SSM would also provide a chief financial officer and a chief nursing officer, that portion of the Management Agreement is not in effect. A temporary CFO was hired but later terminated due to financial constraints and the functions of that position were assumed by employees of the Debtor. SSM briefly employed a chief nursing officer in early 2013, but the person functioning in that role was transitioned to a consulting position due to financial considerations. SSM also provides supervisory and consultation services from St. Anthony's Hospital in Oklahoma City, an affiliate of SSM.

6. The limited scope of management and supervisory services that were anticipated to be provided by SSM is evidenced by the compensation arrangement under the Management Agreement. In addition to the salary of its chief executive officer which is passed through to the Debtor, SSM is paid only $8,333/month for its management and supervisory services.

7. Prior to bankruptcy, in an effort to support the Hospital, SSM supplied numerous services to the Hospital such as pharmacy support, wound care services and other services. The Debtor regularly failed to pay SSM for those services as well as the management fee and SSM is owed $790,639.94 from prepetition services. As further support for the Hospital including to allow it to make payroll at various times, SSM provided the Hospital with a line of credit. As of the petition date, SSM was owed $301,927.40 on this line of credit. Thus, SSM has provided over one million dollars of loans and services in an effort to support the Hospital and the Pauls Valley community.

8. When SSM and the Debtor entered into the Management Agreement, the parties contemplated that SSM might ultimately purchase the Hospital. However, in approximately February, 2013, and again after the commencement of the bankruptcy proceedings, SSM informed the Debtor that SSM had determined that it was not interested in purchasing the Hospital.

9. When the parties entered into the Management Agreement, even though the financial condition of the Hospital was discussed the Debtor failed to disclose to SSM the dire financial situation. The Hospital had over $500,000 of unpaid state and federal withholding taxes and a cash flow situation that ultimately required a letter of credit just to make payroll. Certainly, SSM did not enter into the Management Agreement in contemplation of the need to

manage the Hospital through its dire financial conditions and/or through a Chapter 9 bankruptcy proceeding.

10.  The Debtor has failed to provide the Hospital with necessary financial support, both prepetition and post-petition. By way of example and not by limitation, the Debtor has failed to provide necessary financial support for the following:

(a)  <u>Electronic Medical Records</u>.  Prior to the effective date of the Management Agreement, the Debtor purchased an electronic medical records package from McKesson. Electronic medical records provide significant advantages in many areas of operation of a hospital, including pharmacy records and drug interaction, accumulation of records for safety and compliance purposes, and billing and collection. However, the Debtor failed to purchase all components of the medical records package needed for effective operations with the result that records were not accumulated and coordinated for compliance and reporting purposes. During bankruptcy, rather than completing the purchase of the full electronic medical records package, the Debtor has rejected the McKesson contract and has reverted to a paper records systems.

(b)  <u>Medication Dispensing System</u>. The loss of the McKesson software in the pharmacy department eliminated a significant safety check that had allowed a pharmacist to remotely verify orders prior to a medication being administered to a patient. With the decision to reject the McKesson contract, an alternative solution was proposed to Debtor by SSM to purchase a medication dispensing system to enable the control of drug supply for patient safety and supply tracking. The Debtor delayed the approval of the request to proceed with the Pyxis (medication

dispensing system) even though the Debtor was advised that it would take up to 120 days to setup the medication delivery system.  After approval was finally given, Pyxis decided not to contract with the Debtor due to the financial condition of the Hospital.  Eventually, an agreement was reached for the installation of the Pyxis system which is being installed now and should be operational on or before October 31, 2013.  However, the lack of a medication dispensing system for several months has created medication control and oversight concerns.

(c)     <u>Emergency Room and Other Contractors</u>.  The emergency room is currently being staffed by a third-party contractor.  Certain other services are also provided by contractors.  Several of such contractors have resigned or threatened to resign due to financial considerations.  The Debtor has failed to provide the financial resources necessary to allow for the recruitment and retention of the highest quality providers.

(d)     <u>Employees</u>.  Numerous employees have resigned due to the financial condition of the Hospital and its pending bankruptcy, which has required supplementing essential staff through staffing companies.  This practice greatly increases supervision requirements and creates quality of care issues.

(e)     <u>Capital Items – Compliance Issues</u>.  The Hospital needs capital expenditures of several hundred thousand dollars concerning items that create compliance issues for the Hospital.  The Debtor has been advised of such items, but has failed to provide the necessary financial resources to remedy most of the items identified.

    (f)    <u>Capital Items – Equipment</u>. The Hospital has numerous items of equipment that are at or past normal life. Replacement of the outdated equipment will require the expenditure of several hundred thousand dollars. Again, the Debtor has failed to provide the necessary financial resources to address most of these issues.

    (g)    <u>Capital Items – Plant Operations</u>. The Hospital needs several hundred thousand dollars of expenditures on the roof, HVAC and other physical plant matters.

11. As a result of the financial difficulties at the Hospital and the pending bankruptcy, the scope of services required of SSM under the Management Agreement has greatly increased. In addition to the normal management services SSM agreed to provide under the Management Agreement, SSM is being required to spend significant time and resources recruiting replacement employees, finding replacement contractors and otherwise attempting to maintain quality services under extreme circumstances. The CEO is being required to spend significant time trying to fix issues that are arising as a result of the Debtor's failure to provide the Hospital with the financial resources needed to operate the Hospital in the manner provided for in the Management Agreement. The CEO has also been required to provide significant bankruptcy-related services, all in excess of the services provided for in the Management Agreement.

12. The supervisory services required by SSM have also greatly increased from those contemplated by the Management Agreement. In addition to the normal supervisory services, SSM is being required to address and respond to numerous issues created by the Debtor's failure to provide the Hospital with adequate financial resources and by the pending bankruptcy.

Indeed, in one recent incident that was directly related to the Hospital's inadequate medical records system, the Debtor demanded that SSM

> bring all of its resources to bear to bring the [Debtor] in compliance with the demand set forth in the letter and report of HHS. The [Debtor] further demands that SSM provide a written daily report of what action SSM is undertaking to remedy the issues identified by HHS until final resolution has been achieved.

13.     As a consequence of the Chapter 9 bankruptcy filing, SSM has been required to retain bankruptcy counsel to assist it in addressing the issues created by the bankruptcy and to respond to demands of the Debtor.[1] The Debtor has refused to reimburse SSM for the legal expenses it is incurring. Such burdens are greatly in excess of the services that SSM agreed to perform in the Management Agreement.

14.     The Debtor has informed SSM that it is seeking alternative options for the Hospital other than management by SSM. Therefore, SSM believes that the Debtor has no intention of assuming the Management Agreement. Further, SSM believes that the Debtor is incapable of assuming the Management Agreement as Debtor would be required to cure all defaults, both prepetition and post-petition and provide adequate assurance of future performance. 11 U.S.C. § 365(b). The Debtor will be unable to cure all defaults or provide adequate assurance of future performance.

## RELIEF REQUESTED

15.     SSM seeks an order under 11 U.S.C. § 365(d)(2) requiring the Debtor to reject the Management Agreement promptly or to require the Debtor to elect whether to assume or reject the Management Agreement within a reasonable period not to exceed 30 days.

16.     Under the Management Agreement, the ultimate control and responsibility for the Hospital remained with the Debtor, not SSM. The Management Agreement specifically

---

[1] The legal expenses referenced herein are separate from and in addition to expenses SSM may incur from its status as a creditor.

12099490_1

8

recognized that it was the Debtor, as Owner, that exercised the ultimate control and direction of the assets and affairs of the Hospital and remained solely responsible for the costs of operation of the Hospital.

17.     SSM entered into the Management Agreement based upon the expressed assurance that the Debtor intended to operate the Hospital in a quality manner.  Indeed, the Management Agreement expressly recognizes that the "Primary Goal" of the Management Agreement includes to provide quality hospital services, establish and maintain an excellent public image of the Hospital, establish and maintain quality staffing of the Hospital and to operate the Hospital on a sound financial basis.  However, the Debtor has failed to provide the Hospital with the necessary financial resources to achieve the stated goals.

18.     The Debtor's financial difficulties and pending bankruptcy have created significant structural and operational issues that impact the quality of care at the Hospital.  The Debtor has failed to address such issues and in some instances has taken steps that reduce the quality of care at the Hospital.  The Debtor's determination to reject the McKesson electronic medical records contract and to revert to paper records is a backwards step that impacts the Hospital's ability to timely respond to regulatory and compliance reporting issues.  The Debtor's failure to timely implement a medication dispensing system has created medication control and oversight concerns.

19.     The Debtor's inability or unwillingness to provide the necessary financial resources to "provide quality hospital services," to "establish and maintain an excellent public image of Hospital," and to "establish and maintain quality staffing of Hospital," while requiring SSM to remain as manager of the Hospital is significantly harmful to SSM's reputation.  The Debtor cannot or will not provide the Hospital with the necessary financial resources to allow

SSM to create the quality of care consistent with SSM hospitals as contemplated by the Management Agreement. Yet, when quality of care issues arise, the management of the Debtor publicly tries to shift the blame for such issues onto SSM.

20. The Debtor has substantially changed the scope of services required by SSM under the Management Agreement. When SSM entered into the Management Agreement and agreed to manage the Hospital, the Hospital was operating in a normal manner. However, with the Hospital's entry into bankruptcy, SSM is being required to provide services that it neither agreed to provide nor for which it is being compensated. The CEO, in addition to normal duties of supervising and operating the Hospital, is being required to spend substantial amounts of time recruiting new employees, identifying and hiring new contractors for services at the Hospital, and responding to issues that have been created by the Debtor's failure to provide the Hospital with the resources needed for its operation. In addition, the CEO is being required to provide substantial bankruptcy-related services for the Hospital. SSM is also being required to provide significant additional supervisory and consulting services to address issues resulting from the Debtor's bankruptcy proceeding. SSM has needed to retain bankruptcy counsel to provide it advice concerning the issues arising in the bankruptcy proceeding. However, SSM never agreed under the Management Agreement to provide such services nor is SSM being compensated for such services.

21. Not only has the Debtor significantly increased the scope of services being required of SSM under the Management Agreement, the Debtor in at least one instance has specifically demanded that SSM "bring all of its resources to bear" to resolve an issue that was created by the Debtor's decisions concerning its electronic medical records. While SSM used its resources to address the incident in question, the Debtor had no right to demand such action.

22.     Under 11 U.S.C. § 365, a debtor may assume or reject an executory contract such as the Management Agreement at any time before confirmation of a plan. The court may shorten the time to make that decision. 11 U.S.C. § 365(d)(2). If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531, 1045 S.Ct. 1188, 79 L.Ed 2d 482, 499 (1983). While a non-debtor party may typically be required to continue performance of an executory contract post-petition, *In re Whitcomb & Keller Mortgage Co.*, Inc. 715 F.2d 378 (7th Cir. 1983), the debtor is not permitted to pick and choose which provisions of the contract to enforce. A debtor must either assume an executory contract in its entirety or completely reject it. A debtor cannot accept only the benefits of a contract while eschewing the burdens. *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 (11th Cir. 2007); *In re Cellnet Data Systems, Inc.*, 327 F.3d 242 (3rd Cir. 2003)(the election is an all-or-nothing proposition – either the whole contract is assumed or the entire contract is rejected). Similarly, a debtor may not require a party to effectively enter into a new or amended contract by significantly changing the scope of services being required. Rather, the debtor must deal with the contract as written.

23.     One factor supporting a decision to shorten the time within which the Debtor may assume or reject a lease or executory contract is where a lessor is incurring post-petition losses that are not likely to be compensated under the Bankruptcy Code. *Theatre Holding Corp. v. Mauro,* 681 F.2d 102, 106 (2nd Cir. 1982). By continuing to require SSM to serve as manager of the Hospital where the Hospital is experiencing quality of care issues and the Debtor is unable or unwilling to provide the Hospital with the needed financial resources, SSM's reputation is jeopardized. Further, SSM is being required to provide a significantly greater scope of services

than was bargained for in the Management Agreement. SSM is suffering post-petition losses that will never be compensated. Further, SSM is incurring costs for legal representation addressing issues caused by or arising from the bankruptcy that are not being reimbursed.

24. SSM believes that the Debtor has no intention of ever assuming the Management Agreement and would be incapable of curing all defaults if it chose to do so. Accordingly, the Court should require the Debtor to promptly reject the Management Agreement. Alternatively, the Court should require the Debtor to elect whether to assume or reject the Management Agreement within a reasonable time not to exceed 30 days.

25. The Debtor may assert that requiring a prompt decision to assume or reject the Management Agreement will result in substantial harm to the Debtor including the potential closure of the Hospital. Such a result is not pre-ordained. The Debtor simply needs to hire a replacement CEO and will be able to continue its operations in the normal course as it did prior to execution of the Management Agreement. Prior to the Management Agreement, the Debtor operated the Hospital on an independent basis and could do so again upon termination of the Management Agreement. Other management companies are also available to assume management responsibilities within 30 to 45 days.

WHEREFORE, SSM moves the Court to require the Debtor to promptly terminate the Management Agreement or to shorten the time within the Debtor must elect whether to assume or reject the Management Agreement to a reasonable time not to exceed 30 days.

/s/ Steven W. Bugg
Steven W. Bugg, OBA #1299
McAfee & Taft, A Professional Corporation
10th Fl., Two Leadership Square
211 North Robinson
Oklahoma City, Oklahoma  73102
Telephone:  405/235-9621
Facsimile:  405/235-0439
Email:  steven.bugg@mcafeetaft.com

ATTORNEYS FOR SSM HEALTH CARE OF OKLAHOMA, INC.

### CERTIFICATE OF SERVICE

Pursuant to Local Rule 2002-1(F), notice of this pleading will be served by the ECF System on counsel for the debtor, counsel for the Official Unsecured Creditor's Committee and all parties who have requested notice herein.  In addition, notice of this pleading will be served by first class mail, postage prepaid thereon, to the debtor and the members of the Official Unsecured Creditor's Committee at the addresses set forth below, which together constitute all parties entitled to notice.

Pauls Valley Hospital Authority
100 Valley Drive
Pauls Valley, OK  73075

Mark 5 Care Group, PLLC
Attn: Robert Rader, MD
P.O. Box 118
Mustang, OK  78064

Connect Health Professionals, LLC
Attn:  Derek Michael, RPT, Manager
2411 Springer Drive
Norman, OK  73069

12099490_1

David Christopher Whybrew
c/o Mark Hammons, Esq.
325 Dean A. McGee Avenue
Oklahoma City, OK  73102-3401

Chickasaw Telecom, Inc.
Attn:  Jeffrey Downey
5 North McCormick Street
Oklahoma City, OK  73127

/s/ Steven W. Bugg
Steven W. Bugg

12099490_1

14